[No. A114258. First Dist., Div. One. July 15, 2008.]

JORGE FERNANDEZ et al., Plaintiffs and Respondents, v.
CALIFORNIA DEPARTMENT OF PESTICIDE REGULATION, Defendant
and Appellant;
CALIFORNIA STRAWBERRY COMMISSION et al., Interveners and
Appellants.

**COUNSEL**

Edmund G. Brown, Jr., Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and Anita E. Ruud, Deputy Attorneys General, for Defendant and Appellant.

Law Offices of Tony J. Tanke, Tony J. Tanke; Law Offices of Alison R. Siegel and Alison R. Siegel for Interveners and Appellants California Strawberry Commission and Alliance of Methyl Bromide Industry.

Kahn Soares & Conway and George H. Soares for Intervener and Appellant California Strawberry Commission.

Best Best & Krieger and William J. Thomas for Intervener and Appellant Alliance of Methyl Bromide Industry.

Kahn Soares & Conway, George H. Soares, Rissa A. Stuart and Joshua J. Bettencourt for Croplife America and Western Plant Health Association as Amici Curiae on behalf of Interveners and Appellants.

Jill S. England for California Agricultural Issues Forum as Amicus Curiae on behalf of Interveners and Appellants.

California Rural Legal Assistance, Mike Meuter, Jonathan Gettleman; California Rural Legal Assistance Foundation and Julie L. Montgomery for Plaintiffs and Respondents Jorge Fernandez and Guillermo Ruiz.

Linda J. Krop and Karen Kraus for Plaintiff and Respondent Environmental Defense Center.

## OPINION

**STEIN, J.**—Within the California Environmental Protection Agency (EPA) there are two departments that play a role in the regulation of the use of pesticides in our state, the Office of Environmental Health Hazard Assessment (OEHHA) and the Department of Pesticide Regulation (DPR). The OEHHA is the risk assessment arm of the EPA and helps establish the scientific basis for the risk management decisions of the EPA's regulatory departments, such as the DPR. With regard to pesticide safety, OEHHA and DPR have shared responsibility for developing regulations. While OEHHA does not promulgate those regulations, it is responsible for developing and providing DPR with toxicological information relevant to its risk management decisions. Although the primary responsibility to ensure the safe use of pesticides rests with DPR, it is required to consult with OEHHA concerning risk assessment before adopting those regulations. This case concerns the working relationship between these two departments.

This appeal also concerns the extent of the power of DPR to regulate exposure levels for pesticides used for agricultural purposes. In particular, it concerns whether DPR has the power to identify target levels for subchronic exposure[1] to methyl bromide[2] that exceed levels recommended by OEHHA, and whether DPR is required to work with OEHHA to develop regulations relating to pesticides and worker safety, as opposed to developing

---

[1] Subchronic exposure refers to exposure to a substance over a period of weeks or months, in contrast to acute exposure, which is a short, one-time exposure to higher levels of a substance.

[2] Methyl bromide is a pesticide commonly used in agriculture. It is a gaseous fumigant used to treat soil before planting vegetable, fruit and nut crops, and also is used by flower and forest nurseries. Methyl bromide can be inhaled or absorbed through the skin, and can produce harmful effects on people. It is, however, a highly effective pesticide, with few alternatives, and at least as of 2003, remained one of the most widely used pesticides in the world.

Methyl bromide has been recognized to be an ozone-depleting substance. The United Nations Montreal Protocol therefore scheduled it to be phased out of use by the United States by 2005. The United States, although signing the protocol, continues to allow the use of the substance through critical use exceptions. (Protection of Stratospheric Ozone: Process for Exempting Critical Uses of Methyl Bromide, 70 Fed.Reg. 29494 (May 23, 2005).)

those regulations on its own, soliciting and obtaining OEHHA's comments and recommendations, and then choosing whether or not to follow those recommendations.

We find DPR is required by statute to work jointly with OEHHA while formulating regulations relating to the safety of persons working with or around methyl bromide. This does not mean OEHHA has regulatory authority, but it does mean OEHHA is responsible for one of the many factors DPR must consider when it formulates the regulations. We find only that in balancing the interests affected by that use, DPR may not itself determine the health effects of subchronic exposure to methyl bromide, but must collaborate jointly with OEHHA in determining that question, and DPR further may not ignore OEHHA or its input until after the regulations have been drafted.

As DPR did not include OEHHA in the process leading to the development of the regulations at issue, and as DPR used its own determination of the health effects of methyl bromide, we find DPR violated its mandatory statutory duties. We therefore uphold the trial court's ruling directing DPR to develop regulations for methyl bromide field fumigation, jointly and mutually with OEHHA, and make use of the recommendations of OEHHA's assessment of health risk.

## Parties

This appeal is from a judgment on a petition for writ of mandate and complaint for declaratory and injunctive relief. The petitioners are Jorge Fernandez and Guillermo Ruiz, both of whom live with their families in agricultural areas in California in proximity to fields where methyl bromide has been applied, and whose work brings them into contact with soils treated with methyl bromide, and the Environmental Defense Center, a California nonprofit corporation dedicated to the preservation of the environment in California's south central coast region (hereafter plaintiffs). The petition and complaint was brought against DPR. The California Strawberry Commission and the Alliance of the Methyl Bromide Industry intervened in the proceedings, and have filed their own appellate brief. In addition, amicus curiae briefs have been filed by the California Agricultural Issues Forum, Croplife America and Western Plant Health Association. The interveners and amici curiae essentially support DPR's position, contending the superior court's ruling was error. For purposes of this opinion it will be assumed DPR, interveners and amici curiae adopt one another's arguments, and all will be referred to generally as the arguments of defendants.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

BACKGROUND

*Development of DPR's and OEHHA's powers to regulate pesticide use*

Until 1972, pesticide regulations were more concerned about protecting the consumer than about protecting workers. (Assem. Com. on Environmental Quality, Analysis of Assem. Bill No. 246 (1972 Reg. Sess.) § 1.) In January 1972, Assemblyman Bob Wood introduced Assembly Bill No. 246 (1972 Reg. Sess.) (Assembly Bill 246) to remedy the situation, proposing to add article 10.5, commencing with section 12980, to division 7, chapter 2 of the Food and Agricultural Code (hereafter, article 10.5). Proposed Food and Agricultural Code section 12980[3] provided: "The Legislature hereby finds and declares that it is necessary and desirable to provide for the safe use of pesticides and for safe working conditions for farmworkers, pest control applicators, and other persons handling, transporting, storing, or applying pesticides, or working in and about pesticide-treated areas." Recognizing both the Department of Public Health and the Department of Agriculture had interests in regulating pesticides, the proposed section provided, further, "the development of regulations relating to pesticides and worker safety should be the joint and mutual responsibility of the Department of Agriculture and the Department of Public Health." Section 12981, as proposed, similarly provided, "The State Department of Public Health . . . shall participate in the development of any regulations adopted pursuant to this article. The final decision on matters of public health covered under this article, shall be determined jointly by the Director of Public Health and the director [of Agriculture]." (Assem. Bill 246, as introduced Jan. 27, 1972.)

A few months later, Assembly Bill 246 was amended so that section 12981 no longer provided that the final decision on matters of public health was to be made jointly by the State Department of Public Health and the Department of Agriculture. Instead, it provided, "Such regulations that relate to health effects shall be based upon the recommendations of the Department of Public Health." (Assem. Bill 246, as amended Apr. 10, 1972.) The staff analysis of the bill, as amended, explained, "While the principal responsibility for adopting the required regulations would be vested with the Department of Agriculture, the bill provides that the Department of Public Health 'shall participate in the development of any regulations adopted pursuant to this article.'" Regulations that relate to health effects "shall be based upon the recommendations of the Department of Public Health." The Department of Public Health confirmed it had worked with the author and the Department of Agriculture in preparing the bill, explaining, "This bill would require State Department of Public Health input into pesticide regulations relating to worker health. While currently the Department of Agriculture requests our

---

[3] Statutory references are to the Food and Agricultural Code unless otherwise indicated.

assistance in these matters, they are not required by law to do so. Since worker health is a legitimate interest of the State Department of Public Health, it is most appropriate to have a firm legal basis for Department of Agriculture-Department of Public Health cooperation in this area." (Cal. Dept. Public Health, Enrolled Bill Rep. on Assem. Bill No. 246 (1972 Reg. Sess.).)

The Senate proposed its own bill, Senate Bill No. 21 (1972 Reg. Sess.) (Senate Bill 21), which also sought to create a means of regulating pesticides, but placed ultimate regulatory authority with the Department of Public Health. (Sen. Bill 21, as introduced Jan. 4, 1972.) The Department of Agriculture explained, in supporting Assembly Bill 246 over Senate Bill 21, "The purpose of the bill is to state clearly in the Agricultural Code that regulations concerning the application and use of pesticides as they affect farm worker safety is the responsibility of the Department of Agriculture but any regulation relating to the health and safety of workers is required to be based upon the recommendations of the Department of Public Health. [¶] This bill has been extremely controversial and opposed all along by the California Rural Legal Assistance League which contends that the approach in [Senate Bill] 21 is the proper approach which would give pesticide regulatory authority to the Department of Public Health and Public Health officers. [¶] The bill is extremely important to clearly define the aforementioned responsibilities in connection with farm worker safety and should be enacted into law." (Cal. Dept. Agriculture, Enrolled Bill Rep. on Assem. Bill No. 246 (1972 Reg. Sess.) Aug. 1, 1972.) In the end, the Legislature adopted Assembly Bill 246, with the result that article 10.5 was adopted.

The Department of Agriculture later became the Department of Food and Agriculture. The Department of Public Health became the State Department of Health Services. In 1991, the Governor's Reorganization Plan created the California Environmental Protection Agency, and within it, created both DPR and OEHHA. The Governor transferred the Department of Food and Agriculture's pesticide regulatory program to DPR, including the responsibilities set forth in article 10.5. (Governor's Reorganization Plan No. 1 of 1991, eff. July 17, 1991, 4 Stats. 1991 (Reorganization Plan); and see § 11454.) The Governor transferred the Department of Health Service's "duties and responsibilities relating to hazard identification and risk assessment (i.e., risks from pesticide and chemical residues in food and water [and certain other specified risks])" to OEHHA. (Sen. Com. on Governmental Reorganization, Staff Analysis of Governor's Reorganization Plan No. 1 of 1991, June 5, 1991, p. 102, ¶ 5; and see Health & Saf. Code, § 59004.)[4]

---

[4] Section 11454.1, added as part of the Reorganization Plan, provides: "[DPR] shall conduct pesticide risk assessment as appropriate to carry out its responsibilities set forth in Section 11454 [transferring to DPR the Department of Food and Agriculture's responsibilities relating

As of 1991, then section 12980, as supplemented by the Reorganization Plan, *supra*, section 45, page 34, provided, as it still provides: "The Legislature hereby finds and declares that it is necessary and desirable to provide for the safe use of pesticides and for safe working conditions for farmworkers, pest control applicators, and other persons handling, storing, or applying pesticides, or working in and about pesticide-treated areas. [¶] *The Legislature further finds and declares that the development of regulations relating to pesticides and worker safety should be the joint and mutual responsibility of the Department of Pesticide Regulation and the Office of Environmental Health Hazard Assessment.* [¶] The Legislature further finds and declares that in carrying out the provisions of this article, the University of California, the Department of Industrial Relations, and any other similar institution or agency should be consulted." (Italics added.) Section 12981, as supplemented by the Reorganization Plan, *supra*, section 46, page 33, provides, in relevant part, "The director shall adopt regulations to carry out the provisions of this article. [¶] . . . [¶] *The Office of Environmental Health Hazard Assessment shall participate in the development of any regulations adopted pursuant to this article. Those regulations that relate to health effects shall be based upon the recommendations of the office.* The original written regulations of the office, any subsequent revisions of those recommendations, and the supporting evidence and data upon which the recommendations were based shall be made available upon request to any person." (Italics added.)

In the meantime, in 1988, the Legislature enacted sections 14081 and 14082, concerning methyl bromide and chloropicrin, requiring the Department of Food and Agriculture (and now DPR), to adopt regulations governing the use of methyl bromide and chloropicrin as field fumigants.[5]

---

to the regulation of pesticides]. [OEHHA] shall provide scientific peer review of risk assessments conducted by the department as appropriate to carry out its responsibilities set forth in Section 59004 of the Health and Safety Code." (Reorganization Plan, *supra*, § 27, p. 17.) Health and Safety Code section 59004 provides, in relevant part, that OEHHA "succeeds to, and is vested with, all the duties, powers, purposes, responsibilities, and jurisdiction of the Health Hazard Assessment Division of the State Department of Health Services relating to assessment of human health risks of chemicals and to toxicological and scientific consultation to programs in the State Department of Health Services and in other state agencies. The functions and responsibilities of the office shall include, but not be limited to, those performed pursuant to the following provisions of law: [¶] . . . [¶] (c) Article 10.5 (commencing with Section 12980) . . . ." (Reorganization Plan, *supra*, § 147, p. 141.)

[5] Section 14081 provides, "The director, after investigation and hearing, shall adopt regulations by April 1, 1989, which govern the use of methyl bromide and chloropicrin as field fumigants." Section 14082 provides, "The director may prescribe the time when, and the conditions under which, methyl bromide and chloropicrin may be used in different areas of the state."

*2001–2002 Regulations,* Ventura County *and* Carillo

On October 15, 1999, DPR issued a draft document entitled, "Methyl Bromide Risk Characterization Document for Inhalation Exposure," which, among other things, proposed target levels for human subchronic exposure levels to methyl bromide. These levels primarily were derived from a 1994 study of subchronic toxicity in dogs: the "Newton study." In essence, target exposure levels are based on animal experiments under which animals are exposed to a substance—here methyl bromide—at different levels and over different time periods. The effects on the animals are then reported. A NOEL (no observable effect level) refers to a level at which there is no observable effect. A LOEL (lowest observable effect level) refers to the lowest level at which an effect has been observed. The studies are then analyzed to identify a "critical NOEL" for purposes of calculating the acceptable margin of exposure to a specified substance. The identification of a critical NOEL is far from an exact science. Among other things, there can be a lack of consensus as to whether an "observable effect" is an effect related to exposure to the substance in question or an effect caused by something else entirely. In addition, as studies typically are not conducted on human beings and do not cover all possible levels and lengths of exposure, identifying a critical NOEL involves a process of extrapolation, meaning any identification of a critical NOEL necessarily is only a best estimate. It follows that different analysts may derive different critical NOEL's from the same study and different studies can result in different conclusions as to what the critical NOEL should be.

The Newton study identified a level of 5 parts per million (ppm) to be the lowest level at which adverse effects were observed (i.e., the LOEL).[6] It did not identify a NOEL, but DPR and others, using the Newton study's LOEL, estimated the appropriate critical NOEL from the study to be 0.5 ppm. DPR then identified target levels for human subchronic exposure to methyl bromide, identifying 1 part methyl bromide per billion (ppb) to be the target level for the general public and 2 ppb to be the target level for adult workers.

On February 14, 2002, after an extensive review process, DPR issued a three-volume "Methyl Bromide Risk Characterization Document [for] Inhalation Exposure" (Risk Characterization Document), which, as relevant, continued to identify target levels for subchronic exposure to methyl bromide of 1 ppb for the general public and 2 ppb for adult workers. DPR also adopted permanent methyl bromide field fumigation regulations, which, after they

---

[6] Sometimes the terms NOAEL or LOAEL are used, referring to "no observable adverse effects level" and "lowest observable adverse effects level." There appears to be no difference between a NOEL and a NOAEL or a LOEL and a LOAEL.

were approved by the Office of Administrative Law, became effective on January 14, 2001.[7] Additional emergency regulations were added, becoming permanent in April 2002.

The regulations were challenged almost immediately by environmental groups and field workers. Two cases, *Environmental Defense Center v. Department of Pesticide Regulation* (Super. Ct. S.F. City and County, 2002, No. 515270) and *Ventura County Agricultural Association v. Department of Pesticide Regulation* (Super. Ct. Sacramento County, 2002, No. 01CS00336) were consolidated in the San Francisco County Superior Court, which in April 2002 voided the regulations. The court found section 11454.2, and a 1992 memorandum of agreement between DPR and the Department of Food and Agriculture, required DPR to consult with the Department of Food and Agriculture in enacting the regulations, but DPR had failed to do so.[8] DPR did not appeal that ruling, although it maintains the ruling was erroneous.

In the meantime, another challenge to the regulations was filed in the Monterey County Superior Court (*Carrillo v. Department of Pesticide Regulation* (Super. Ct. Monterey County, 2002, No. M55400)). The parties to the Monterey proceedings resolved that case by means of a May 14, 2002 settlement under which DPR agreed to repromulgate regulation of methyl bromide, and in so doing, to consider the regulation of subchronic methyl bromide exposure. DPR filed emergency regulations to repeal and readopt the regulations struck down by the San Francisco Superior Court, pending further research and review. The readopted regulations became effective on September 22, 2002, and January 21, 2003.

*Development of 2003 Regulations*

On February 3, 2003, DPR issued an addendum to volume I of the Risk Characterization Document (the Addendum). By that time, a new study had taken place, the "Schaefer study." The author of the Schaefer study reported no effects from subchronic exposure to methyl bromide had been observed at a level of 20 ppm. This finding was markedly different from the Newton study's identification of 5 ppm as the lowest dose at which effects had been observed, which then led to the determination of the critical NOEL of 0.5 ppm. DPR subjected the Schaefer study to scientific reviews conducted by its

---

[7] Section 14081 required DPR to adopt the regulations by April 1, 1989. DPR did not meet that deadline.

[8] Section 11454.2, enacted at the same time the Legislature transferred the Department of Agriculture's general responsibilities over pesticide regulation to DPR, requires DPR to "consult with the Department of Food and Agriculture in any action relating to . . . denial of new active ingredient registrations, suspension or cancellation of pesticide registrations or uses, or other measures adopted to mitigate unacceptable adverse pesticidal effects."

own medical toxicology staff and by a researcher at the University of California, Davis. DPR found the general consensus to be that a critical NOEL of 5 ppm was appropriate—significantly lower than the author's proposal of 20 ppm, but significantly higher than the critical NOEL of 0.5 ppm based on the Newton study. DPR then proposed to revise the critical NOEL upwards to 5 ppm. It held a public workshop to present staff analysis on subchronic exposure levels to methyl bromide. In addition, DPR's proposal and the supporting documents were submitted to a formal external scientific review conducted at the University of California, Davis. The United States Environmental Protection Agency conducted a toxicology review. DPR then determined the appropriate target levels for methyl bromide should be 9 ppb (up from 1 ppb) for the general public, and 16 ppb (up from 2 ppb) for adult workers, asserting those "target levels will provide an adequate margin of safety for human subchronic exposure to methyl bromide."

It is undisputed DPR did not consult OEHHA before it proposed the changes in target levels for subchronic exposure to methyl bromide. OEHHA was not involved in the analysis of the Schaefer study, provided no input into DPR's analysis, and made no recommendations as to the appropriate target levels for methyl bromide in light of the Schaefer study or the various analyses of the study. After DPR issued the Addendum, and as part of its public notification process, DPR made the Addendum available to OEHHA. DPR also invited OEHHA to a public workshop, explaining DPR's intention to present a staff analysis "of the significant endpoints for subchronic exposures to methyl bromide." DPR explained to OEHHA, as it explained to the other persons and organizations notified about the meeting, it would "be soliciting comments on the appropriate regulatory target value we should use in the regulations to address subchronic exposures." OEHHA responded with a March 11, 2003 letter. By that time, OEHHA had obtained and reviewed the Schaefer study. OEHHA reported neither the Newton study nor the Schaeffer study was perfect, but it could find nothing to suggest the Newton study was unreliable and could identify no scientific basis for giving more weight to the Schaefer study than to the Newton study. OEHHA concluded, "Therefore, for the purposes of risk assessment and mitigation, OEHHA finds that the results of the Newton (1994) study provide sufficient evidence for the most sensitive toxic effect of [methyl bromide] to be used as an end point for subchronic (seasonal) exposures." DPR's toxicologists responded to comments, including those of OEHHA, developed during the workshop and related proceedings. They noted some reviewers believed the NOEL should be higher than 5 ppm, while OEHHA continued to recommend a LOEL of 5 ppm, which necessarily implied the NOEL should be even lower. DPR explained its reasons for selecting 5 ppm as the NOEL, and in doing so specifically addressed OEHHA's comments and concerns.

In September 2003, DPR filed notice it was proposing to repeal and readopt sections 6450, 6450.1, 6450.2, and 6450.3,[9] and to amend sections 6000 and 6784 of title 3 of the California Code of Regulations, pertaining to the use of methyl bromide. DPR explained it had determined the appropriate target levels for subchronic exposure to methyl bromide should be 16 ppb for adults and 9 ppb for children, based on a critical NOEL of 5 ppm. An extensive public comment period followed. During the public comment period, OEHHA submitted memoranda maintaining the Schaeffer study was flawed, urging DPR to adopt the findings in the Newton study. For example, a November 10, 2003 memorandum reiterated OEHHA's position the Schaeffer study's results were not sufficiently compelling to identify 5 ppm as a NOEL. OEHHA noted a lack of clear consensus on the point and inadequate toxicity information for infants and children, asserting its position that a LOEL of 5 ppm would be more protective of the public health. A March 26, 2004 memorandum, responding to a later draft of the regulations, reiterated OEHHA's recommendation that the regulations be based on target air concentration levels of 1 ppb and 2 ppb for residential and occupational exposures, respectively, for subchronic exposures to methyl bromide. OEHHA mentioned the point again in a July 2004 memorandum, responding to additional modifications made by DPR. In the end, despite OEHHA's comments and recommendation, and the comments of others urging DPR to adopt the lower concentration levels as the appropriate target levels for subchronic exposure, DPR's regulations continued to target the higher concentration of 16 ppb for adult workers and the lower concentration of 9 ppb for the general public. The regulations went into effect on November 3, 2004.

*Superior Court's Ruling*

On December 1, 2004, plaintiffs filed a petition for writ of mandate in the San Francisco Superior Court, attacking the new regulations. As relevant to this appeal, the superior court concluded DPR had failed to fulfill "the statutorily mandated ministerial duty of section 12981 of the Food and [Agricultural] Code when it failed to 'base' " its regulations on subchronic exposure levels on the levels recommended by OEHHA. The court also found DPR failed to fulfill a ministerial duty, mandated by statute, that required it jointly and mutually to develop the regulations, finding DPR "did not work in a unified and shared process with OEHHA in developing the Regulations." The court reasoned, "Although OEHHA did participate in the development of the Regulations, this participation did not rise to the level of the 'joint and

---

[9] California Code of Regulations, title 3, former sections 6450, 6450.1, 6450.2, and 6450.3 were renumbered without substantive change as California Code of Regulations, title 3, sections 6447, 6447.1, 6447.2, and 6447.3, respectively, in January 2008. We refer to these code sections by the numbering system in place prior to the 2008 revision, as this is the numbering scheme used in the trial court.

mutual' development mandated by section 12980" because DPR simply treated OEHHA equally with the other consulting agencies. Finally, the court, citing Government Code section 11349, found California Code of Regulations, title 3, sections 6450, subdivision (h), 6450.2, subdivision (a), and 6784, subdivision (b)(2)(C), could not be easily understood by those persons directly affected by them, and therefore were invalid as lacking clarity. The court therefore issued a writ of mandate directing DPR to comply with section 12980 by jointly and mutually developing with OEHHA regulations for methyl bromide field fumigation, comply with section 12981 by basing regulations for methyl bromide field fumigation upon OEHHA's subchronic exposure level recommendations and comply with the California Administrative Procedures Act (Gov. Code, §§ 11349, 11349.1) by clarifying the cited sections.

**DISCUSSION**

**I.**

**OEHHA's Recommendations and Involvement in
Developing Regulations**

■ Where, as here, the issues involve questions of statutory interpretation, our task is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].) This task may involve up to three steps. " '[W]e first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 [36 Cal.Rptr.3d 650]; see *id.* at p. 1087 (*MacIsaac*).)

As a general rule, we attempt to give the words of a statute their "plain and commonsense meaning." (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 577 [110 Cal.Rptr.2d 809, 28 P.3d 860].) Here, although each party essentially contends there is a "plain meaning" to each of the statutes in question, they do not, unsurprisingly, agree as to exactly what that plain meaning is. Moreover, we do not view the words of a statute in isolation, but construe them in context, keeping in mind the statutory purpose, interpreting legislation reasonably and attempting to give effect to the apparent purpose of the statute. (*MacIsaac, supra,* 134 Cal.App.4th at p. 1083.)

We also have the advantage of the decision in *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502 [208 Cal.Rptr. 850, 691 P.2d 606] (*Western Oil*), where the Supreme Court construed the meaning of a provision

in Health and Safety Code section 39606 nearly identical in language to one of the provisions at issue here. Health and Safety Code section 39606 requires the State Air Resources Board (Board) to adopt standards of ambient air quality, providing in pertinent part that "[s]tandards relating to health effects are required to be 'based upon the recommendations of the [Department of Health Services].' " (*Western Oil*, at pp. 506–507, citing Health & Saf. Code, § 39606, subd. (b).) According to the Board, in an argument very similar to that made by defendants here, "the recommendation is the starting point and based on the evidence received at its hearing, the Board may depart from the recommendation." (*Western Oil*, at p. 510.) The Supreme Court disagreed. It pointed out terms such as "recommends" and "recommendations" are used in the codes both in a mandatory and advisory sense, but when such a term is coupled with a mandatory "shall," there is a strong indication the term is used in a mandatory sense. (*Id.* at p. 511.) The court concluded, "[T]he Board must follow [the Department of Health Services'] recommendations for standards relating to health effects. However, this does not mean that the standards of ambient air quality adopted by the Board must be identical to those recommended by the [Department of Health Services]. [Health and Safety Code] [s]ection 39606 enumerates several matters the Board must consider in addition to health effects, and the Board must take all these factors into account in determining the standards of ambient air quality. What the Board may not do is to substitute its judgment for that of the [Department of Health Services] in determining health effects." (*Western Oil*, at p. 512.)

The Supreme Court's point was illustrated further by its reasoning in connection with standards the Board had adopted for sulfur dioxide. The Department of Health Services had determined no report indicated health effects as a result of concentrations at less than 0.10 ppm averaged over a 24-hour period. The Department of Health Services believed it was rational to apply a margin of safety, but could find no scientific basis for applying any particular margin of safety below the level of the 0.10 ppm standard, concluding that an existing air quality standard of 0.04 ppm was reasonable. The Board accepted the Department of Health Services' determination of no health effects at levels less than 0.10 ppm, but applied its own safety factor, adopting a standard of 0.05 ppm for a 24-hour period. (*Western Oil, supra*, 37 Cal.3d at p. 515.) The trial court found the Board lacked authority to impose any safety factor, but was obligated to adopt the 0.10 ppm standard outright. (*Ibid.*) The Supreme Court reversed, finding the Board had followed the Department of Health Services' recommendations even though it adopted neither the 0.10 ppm standard nor that standard modified by the safety factor suggested by the Department of Health Services. It was enough that the evidence supported the safety factor actually used by the Board. (*Id.* at p. 516.)

The Supreme Court explained: "However, while the Board was required to consider the [Department of Health Services's] recommendations as to health effects, it was not required to adopt the [Department of Health Services's] recommended air pollution levels as California's ambient air quality standards. The Board must evaluate a number of additional factors in establishing its standards, and, because of the grave health risks posed by air pollution, the Board may incorporate 'margins of safety' and thus adopt air standards higher than those recommended by the [Department of Health Services]." (*Western Oil, supra,* 37 Cal.3d at p. 507.)

The Supreme Court's construction of the phrase "based upon the recommendations," if adopted here, would mean DPR is required by statute to accept OEHHA's recommendations as to health effects, i.e., OEHHA's determination that 0.5 ppm methyl bromide is the critical NOEL, and DPR may not use a different critical NOEL for purposes of adopting regulations relating to pesticides and worker safety. In *Western Oil, supra,* 37 Cal.3d 502, the Board, after considering the relevant factors, ultimately adopted air standards higher than those recommended by the Department of Health Services. We do not read that case as holding that the Board was prohibited from adopting air standards *lower* than those recommended by the Department of Health Services, and we do not find DPR here is prohibited from enacting regulations that may result in higher levels of exposure to methyl bromide than the levels recommended by OEHHA. We find only that under *Western Oil,* DPR would not be required to adopt OEHHA's recommendations as the target levels for exposure to methyl bromide if a justification exists for the levels DPR actually adopts in regulating the substance as a pesticide.

■ Generally, where the language of a statute uses terms that have been judicially construed, " ' "the presumption is almost irresistible" ' " that the terms have been used ' "in the precise and technical sense which had been placed upon them by the courts." ' " (*People v. Lawrence* (2000) 24 Cal.4th 219, 231 [99 Cal.Rptr.2d 570, 6 P.3d 228].) The reasoning is that "[t]he Legislature is presumed to be aware of other statutes on the same or analogous subject matter in which the same language is used." (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 504 [66 Cal.Rptr.2d 304, 940 P.2d 891].) The presumption is less compelling here than in other cases as *Western Oil, supra,* 37 Cal.3d 502, was decided in 1984, well *after* section 12981 was enacted. Nonetheless, it is not unreasonable to assume the Legislature meant the same thing when it used the same words, so the Supreme Court's determination of the Legislature's intent in connection with Health and Safety Code section 39606 has at least some persuasive value. Moreover, the Legislature could have, but did not, change the wording of section 12981 in 1991 when DPR was established and the section was amended accordingly.

Defendants emphasize that in *Western Oil,* the Supreme Court found it highly persuasive that at the times relevant there, the Board had little or no medical expertise, while the Department of Health Services employed qualified health experts. Pointing out that the relationship of air pollution to disease involves complex matters, and studies on the subject were of questionable validity, the court found "there is little reason to conclude that the Legislature intended to permit a Board lacking the expertise necessary to evaluate these studies to reject recommendations by the [Department of Health Services] as to health effects." (*Western Oil, supra,* 37 Cal.3d at p. 511.) As defendants point out, DPR *does* have medical expertise and is perfectly capable of evaluating the studies and drawing its own conclusions. Nevertheless, it appears the Department of Food and Agriculture did *not* have medical expertise when the Legislature first established article 10.5. (See Assem. Com. on Labor, Employment & Consumer Affairs, analysis of Assem. Bill No. 1090 (1979–1980 Reg. Sess.) Apr. 24, 1979, pp. 2–3 (April 24 analysis).) The Supreme Court's reasoning in *Western Oil,* therefore, applies equally to section 12981 as of the time it first was adopted.

In addition, in 1979, the Legislature recognized that the Department of Food and Agriculture had obtained its own medical expertise, but nonetheless *rejected* an attempt to weaken the role of the Department of Health Services so that its recommendations would be only advisory. As to that attempt, part of Assembly Bill No. 1090 (1979–1980 Reg. Sess.) (Assembly Bill 1090), an analyst for the Assembly Committee on Labor, Employment & Consumer Affairs explained, "When the pesticide worker safety laws were first passed in 1972, the Department of Food and Agriculture did not have a medical or toxicological staff and the Department of Health Services was given joint responsibility for developing regulations because of its experience and expertise in this area. In recent years, [the Department of Food and Agriculture] has added several persons with medical and toxicological knowledge to its Worker Safety Unit. [¶] [Assembly Bill] 1090 recognizes that [the Department of Food and Agriculture] has staff with expertise in health matters and proposes that the role of the Department of Health Services in developing worker safety regulations be weakened and that [the Department of Food and Agriculture] become solely responsible for the final content of these regulations." (Apr. 24 analysis, *supra,* at pp. 2–3.) In its original form, Assembly Bill 1090 would have deleted from section 12981 any requirement that the Department of Health Services participate in the development of regulations adopted pursuant to article 10.5, and any requirement that regulations relating to health effects be based upon the recommendations of the Department of Health Services. Instead, section 12981, subdivision (f) would read, "The State Department of Health Services shall advise the director concerning the development of any regulations adopted pursuant to this article." (Legis. Counsel's Dig., Assem. Bill No. 1090 (1979–1980 Reg.

Sess.) as introduced Mar. 21, 1979, p. 2.) This change, however, was dropped by May 1979, when Assembly Bill 1090 was amended to retain the provisions requiring the Department of Health Services to participate in the development of the regulations and requiring regulations relating to health effects to be "based upon the recommendations of the State Department of Health Services." (Assem. Bill 1090, as amended May 1, 1979.) The Department of Health Services explained: "The current requirement that [Department of Health Services] share equal status with [Department of Food and Agriculture] in developing worker safety regulations resulted from extensive legislative hearings several years ago. It was decided that the most cost-effective and practical method of arriving at adequate worker safety regulations was to combine the expertise and absence of interests which conflict with health protection in [the Department of Health Services], with the resources for enforcement and related pesticide responsibilities of the [Department of Food and Agriculture]. The Department [of Health Services] opposed [Assembly Bill] 1090 in its original form as it would have removed [the Department of Health Services] from joint responsibility for development of regulations. On May 1, the bill was amended to reinstate [the Department of Health Services] to its present role in developing regulations. The Department [of Health Services] then took a neutral position." (Cal. Health & Welfare Agency, Enrolled Bill Rep. on Assem. Bill No. 1090, July 25, 1979.)

■ Legislative committee reports are not conclusive evidence of legislative intent (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 508 [247 Cal.Rptr. 362, 754 P.2d 708]), and the Legislature of course may choose to reject proposed legislation for reasons not apparent from the record. Nonetheless, the legislative materials, together with the amendment to Assembly Bill 1090, indicate the Legislature made a conscious choice against reducing the Department of Health Services' role to that of an advisor to the Department of Food and Agriculture, choosing instead to continue to require pesticide regulations to be the "joint and mutual responsibility" of the two agencies, and to require the Department of Food and Agriculture to adopt the Department of Health Services' recommendations as to health effects, despite its awareness the Department of Food and Agriculture had gained its own medical expertise.

■ We find that both the language of sections 12980 and 12981, and the relevant legislative history explained in part by later legislative analysis, support a conclusion the Legislature intended the Department of Health Services, and now OEHHA, to be not just an advisor, but an active participant in developing regulations relating to pesticides and worker safety, and that while DPR is charged with managing the risks of pesticides on worker safety, it is OEHHA and not DPR that is to assess what those risks are.

█ We do not agree with defendants that conferring risk management authority on DPR but reserving risk assessment to OEHHA is fatally inconsistent with the statutory scheme as a whole. We construe statutory language in context, considering the nature and purpose of the statutory enactment, seeking to harmonize its provisions to the extent possible. (*Goodman v. Williams* (2003) 107 Cal.App.4th 294, 300–301 [132 Cal.Rptr.2d 106].) We also consider statutes with other legislation on the same subject. (*Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 [99 Cal.Rptr.2d 792, 6 P.3d 713].) "If they conflict on a central element, we strive to harmonize them so as to give effect to each. If conflicting statutes cannot be reconciled, later enactments supersede earlier ones [citation], and more specific provisions take precedence over more general ones [citation]." (*Ibid.*) We attempt, if possible, to avoid a construction that renders a part of a statute meaningless or inoperative. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274 [41 Cal.Rptr.2d 220, 895 P.2d 56]), and " '[a]ll presumptions are against a repeal by implication.' [Citation.]" (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419 [201 Cal.Rptr. 384, 777 P.2d 157] (*Monterey Bay*).) Defendants contend a construction requiring DPR to adopt OEHHA's recommendations is fatally inconsistent with section 12980's mandate that DPR consult with the University of California and the Department of Industrial Relations and with a multitude of statutes that identify DPR as the exclusive regulatory authority on the sale and use of pesticides in California. The contention is founded on the assumption DPR will be required to adopt OEHHA's recommendations as the target levels for exposure to methyl bromide, thereby rendering consultation with other entities pointless. █ These problems do not exist if, as we have concluded, OEHHA's "recommendations" are viewed as simply one factor DPR is to consider when it determines target levels.

Defendants cite other statutory provisions, which *do* confer risk assessment authority on DPR, such as the Tanner Act (Health & Saf. Code, §§ 39650–39674) (Tanner Act),[10] "which established an elaborate process for the [State Air Resources Board] to identify substances as being 'toxic air contaminants' and to adopt 'airborne toxic control measures' for those contaminants." (*Monterey Bay, supra,* 49 Cal.3d at p. 412.) Health and Safety Code section 39655 provides a "toxic air contaminant which is a pesticide shall be regulated in its pesticidal use by [DPR] pursuant to Article 1.5

---

[10] Plaintiffs point out DPR cited section 12981 as authority for the regulations at issue here, but did not cite the Tanner Act, and has never asserted its assessment of health risks was conducted under the act. Plaintiffs also complain defendants did not argue below that the act effectively subsumed article 10.5. Defendants' theory, however, involves a question of law to be applied to undisputed facts, and therefore may be considered for the first time on appeal. (*Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15–16 [1 Cal.Rptr.2d 805].)

(commencing with Section 14021) of Chapter 3 of Division 7 of the Food and [Agricultural] Code." Food and Agricultural Code section 14022 requires DPR, "[i]n consultation with" OEHHA, to "evaluate the health effects of pesticides which may be or are emitted into the ambient air of California and which may be determined to be a toxic air contaminant which poses a present or potential hazard to human health." (§ 14022, subd. (a).) In conducting the evaluation, DPR is directed to consider "all available scientific data, including, but not limited to, relevant data provided by [OEHHA] . . . ." (§ 14022, subd. (c).)[11] Section 14024 requires DPR to develop measures to control those pesticides when it has been determined some form of control is required. In defendants' view, sections 12980 and 12981 cannot be reconciled with the Tanner Act if OEHHA is given risk assessment authority.

■ We do not agree. Sections 12980 and 12981 concern regulations for worker safety. While the Tanner Act's more general provisions certainly could cover issues of worker safety, the act focuses on the effects of emissions into the ambient air, not the health effects of pesticides on those working in close proximity to them. The statutory scheme can be harmonized by finding OEHHA has risk assessment authority for the health effects of pesticides on those working in close proximity to them, including the subchronic effects of methyl bromide, while DPR has authority to determine the health effects from releasing toxic substances into the ambient air, and for purposes of that determination should consider OEHHA's recommendations, but is not bound by them. Moreover, defendant's construction effectively acts as an implied repeal of those provisions of sections 12980 and 12981 conferring special status on OEHHA in connection with pesticide regulation.
■ We would construe the Tanner Act as a repeal of sections 12980 and 12981 only if there were " '*no possibility* of concurrent operation' . . . [and] . . . 'the later provision gives *undebatable evidence* of an intent to supersede the earlier.' " (*Monterey Bay, supra,* 49 Cal.3d at p. 420, quoting *Hays v. Wood* (1979) 25 Cal.3d 772, 784 [160 Cal.Rptr. 102, 603 P.2d 19], italics added by the court in *Monterey Bay.*) We recognize defendants' arguments as to the difficulty of incorporating different assessments of health effects into different regulations, but difficulty of operation is not the same thing as undebatable evidence of an intent to supersede.

Defendants cite a staff analysis of the Reorganization Plan, conducted by the Senate Committee on Governmental Organization. Paragraph 4 of the analysis recites the plan "would create [DPR] within [the California Environmental Protection Agency] and transfer to DPR the pesticide regulatory program from the State Department of Food and Agriculture . . . . 'Risk assessment' associated with pesticide regulation and use would be within

---

[11] Methyl bromide, like many other pesticides, is a "toxic air contaminant" for purposes of the Tanner Act. (§ 14021, subd. (b); 42 U.S.C. § 7412(b)(1).)

[DPR]'s jurisdiction." Paragraph 5 recites, "In addition [the plan] would create [OEHHA] within [the California Environmental Protection Agency] and transfer from the Health Hazard Assessment Division of [the Department of Health Services] specified duties and responsibilities relating to hazard identification and risk assessment (i.e., risks from pesticide and chemical residues in food and water, management of [Proposition] 65 programs, and risk assessment of hazardous waste sites and other potentially dangerous situations.)" (Sen. Com. on Governmental Reorganization, Staff Analysis of the Governor's Reorganization Plan No. 1 of 1991, p. 101, ¶¶ 4, 5.) We agree the staff analysis supports defendants' interpretation of DPR's risk assessment authority. The staff analysis does not, however, reflect the actual language of affected statutes, which carried forward existing risk assessment duties and, even under defendants' construction of section 12981, expressly requires OEHHA to assess the health risks of pesticides in connection with worker safety, as opposed to pesticide residues in food and water.[12] The staff analysis, therefore, while of some value, does not persuade us the Legislature, in agreeing to the Governor's reorganization plan, intended to reduce and alter the responsibilities of the Department of Health Services when it transferred those duties to OEHHA.

Defendants point out DPR and OEHHA have acted as if DPR had authority to reject OEHHA's assessment of the risks of subchronic exposure to methyl bromide. Although an agency's interpretation of the meaning and effect of a statute is entitled to consideration and respect by the courts (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031]), its interpretation is simply the agency's legal opinion, and the deference to which it is entitled depends on the extent to which the agency's expertise in the area provides it with special familiarity with satellite legal and regulatory issues. (*Id.* at p. 11; see also *id.* at pp. 12–15.) Here, there is no evidence either agency had any special expertise or specialized knowledge that would aid in determining the Legislature's intent in enacting article 10.5. Further, neither agency actually interpreted anything; both simply acted as if OEHHA's role was more or less limited to that of an advisor, a limitation that exists in other statutes, such as the Tanner Act. Under the circumstances we do not view DPR's assumption of its own authority or OEHHA's failure to protest to be evidence of the Legislature's intent sufficient to overcome the other evidence indicating a contrary legislative intent.

For all of the above reasons, we conclude section 12981 requires DPR, in developing regulations for pesticides and worker safety, to collaborate closely with OEHHA in determining the health risks from exposure to pesticides, including methyl bromide. For similar reasons we also find DPR

---

[12] We of course take no position on the relative duties of DPR and OEHHA with respect to the health risks regulated by other statutes.

may not develop regulations on its own, inform OEHHA of them and then choose whether or not to adopt any recommendations made by OEHHA. Rather, under section 12980, DPR, although retaining ultimate regulatory authority, must work with OEHHA's recommendations during the development process.

## II.

### Regulations as Affecting Worker Safety

The trial court found DPR violated its mandatory statutory duties with respect to the regulations set forth in California Code of Regulations, title 3, sections 6450, subdivision (h); 6450.2, subdivision (a), and 6784, subdivision (b)(2)(C).[13] Defendants concede California Code of Regulations section 6784, subdivision (b)(2)(C) is a worker safety regulation in that it states the conditions under which employees are required to wear respirators or other air-supplying respiratory protection. They contend California Code of Regulations sections 6450, subdivision (h), and 6450.2, subdivision (a), however, were *not* worker safety regulations and therefore not subject to OEHHA's involvement and recommendations pursuant to Food and Agricultural Code sections 12980 and 12981.

 California Code of Regulations, title 3, section 6450 as a whole clearly applied to worker safety. Its introductory paragraph defined "fumigation-handling activities." California Code of Regulations, title 3, section 6450, subdivision (a) required the operator to submit a work plan that included a description of any activities within the buffer zones and a description of any workday/work hour limitations and respiratory protections, and subdivision (c) required the commissioner to include buffer zone requirements and work-hour requirements when conditioning a permit. California Code of Regulations, title 3, section 6450, subdivision (h) provided, "[DPR], in coordination with county agricultural commissioners, shall ensure that ambient air concentrations of methyl bromide do not exceed an average daily non-occupational exposure of nine parts per billion in a calendar month." While California Code of Regulations, title 3, section 6450, subdivision (h) did refer to nonoccupational exposure, and certainly had an impact on the general public, it also had a direct impact on those who worked with and around methyl bromide. We do not read the section as excluding exposure to workers (so that, for example, there would be no need to measure emissions

---

[13] California Code of Regulations section 6450 regulated the fumigation of specified lands. California Code of Regulations section 6450.2 sets standards for creating and maintaining buffer zones around fumigated property. California Code of Regulations section 6784 also regulated field fumigation, and in subdivision (b), sets forth employee protection requirements.

if the only persons affected were workers), but as a recognition that the more conservative measure should be used when emissions will affect not only workers but the public in general. Furthermore, it can be assumed the level would change if OEHHA's recommendations for worker exposure are adopted.

 California Code of Regulations, title 3, section 6450.2, subdivision (a) provided, "The commissioner shall approve buffer zone sizes and durations based upon local conditions. . . . At no time shall the inner buffer zone be less than 30 feet, and the outer buffer zone be less than 60 feet, or the buffer zone durations be less than 36 hours." Defendants assert California Code of Regulations, title 3, section 6450.2, subdivision (a) was intended to protect the environment and human health outside of the occupational setting. Again, in the absence of a regulation that alters the buffer zones when the only affected persons are those working in close proximity to methyl bromide, a more accurate description is that the buffer zone requirements in California Code of Regulations, title 3, section 6450.2 applied to protect both nonworkers and workers.

 Defendants point out the regulations provide guidance to operators on the *use* of methyl bromide, arguing that they should not be viewed as regulations affecting worker safety. The reason for regulating the *use* of methyl bromide is to protect those who may come into contact with it. It follows that the regulations, although directed at operators, are nonetheless governed by sections 12980 and 12981 to the extent they "provide for the safe use of pesticides and for safe working conditions for farmworkers, pest control applicators, and other persons handling, storing, or applying pesticides, or working in and about pesticide-treated areas." (§ 12980.) We conclude, therefore, that all three regulations fall under sections 12980 and 12981.

## III.

### Clarity

The trial court also found the regulations to lack clarity. As we have determined the regulations are invalid, we have no reason to address the trial court's reasoning. We also have no reason to consider whether plaintiffs are entitled to challenge the regulations for lacking clarity or whether the regulations indeed are fatally unclear. We decline to do so.

## CONCLUSION

 After reviewing the arguments of the parties, the record and the relevant legislative history, we find the regulations are invalid in that they were not the result of a joint effort by DPR and OEHHA and that they are based on DPR's own assessment of the health risks resulting from subchronic exposure to methyl bromide.

The judgment is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

Petitions for a rehearing were denied August 11, 2008, and the opinion was modified to read as printed above. The petition of interveners and appellants for review by the Supreme Court was denied October 1, 2008, S166224. Kennard, J., did not participate therein. Baxter, J., was of the opinion that the petition should be granted.