Filed 6/10/20; Certified for Publication 7/8/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL, | C079260 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-80001868-CU-WM-GDS) |
| v. | |
| OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT et al., | |
| Defendants and Respondents. | |

Proposition 65, also known as the Safe Drinking Water and Toxic Enforcement Act of 1986 (Health & Saf. Code, §§ 25249.5-25249.13), requires the Governor to publish a "list of those chemicals known to the state to cause cancer or reproductive toxicity." (Health & Saf. Code, § 25249.8.) In 2013 the Carcinogen Identification Committee (Committee) voted to list the chemical diisononyl phthalate (DINP) as a cancer causing chemical. DINP is used to soften vinyl for use in flooring, wire insulation, gloves, garden hoses, artificial leather, and roofing materials. The Committee concluded DINP causes various types of cancer in animals and that the mechanisms by

1

which DINP causes cancer in animals are relevant to humans.  Subsequently, the Office of Environmental Health Hazard Assessment (OEHHA) added DINP to the Proposition 65 list.  Plaintiff American Chemistry Council (Chemistry) challenged the action, arguing it was arbitrary and capricious.  The Chamber of Commerce of the United States filed an amicus curiae brief in support of Chemistry.  Chemistry appeals the trial court's denial of its petition for writ of mandate, arguing there is insufficient evidence that DINP causes cancer in humans.  We shall affirm the judgment.

<strong>FACTUAL AND PROCEDURAL BACKGROUND</strong>

**Proposition 65 Process**

Proposition 65 involves a two-step process.  First, chemicals are placed on a list of substances known to cause cancer or reproductive toxicity.  (Health & Saf. Code, § 25249.8, subd. (a).)[1]  Second, the statute prohibits businesses from exposing individuals to listed chemicals without providing a warning and from discharging listed chemicals into sources of drinking water unless the business can establish that the exposure or the discharge to drinking water is below the level that will pose no significant risk.  (§§ 25249.5, 25249.6, 25249.9, 25249.10, subd. (c).)

Chemicals must be listed under Proposition 65 if they are identified as causing cancer or reproductive toxicity on the basis of animal studies.  Proposition 65 "applies to those chemicals which respected scientific agencies have already determined cause cancer or reproductive toxicity in humans or animals." (*AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 441.)  Human testing is unethical, and because of the long latency period of human cancers, waiting for human studies cannot adequately protect humans from the risk of cancer.  As a consequence, the principle of extrapolating from evidence

---

[1] All further statutory references are to the Health and Safety Code unless otherwise noted.

of cancer in animals to humans " 'has been accepted by all health and regulatory agencies, and is regarded widely by scientists in industry and academia as a justifiable and necessary inference.' " (*Id.* at p. 438, fn. 7.)

OEHHA must list a chemical: (1) if the chemical is identified by reference in certain Labor Code sections; (2) if a body considered authoritative by the group of independent scientists known as the state's qualified experts has formally identified the chemical as causing cancer; (3) if a state or federal agency has formally required the chemical to be labeled or identified as causing cancer (§ 25249.8, subds. (a), (b)); or (4) upon review by the state's qualified experts who, in their opinion, determine "the chemical has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer" (§ 25249.8, subd. (b)). This case involves the fourth mechanism for identifying cancer causing chemicals.

**Committee Composition and Guidance Criteria**

Independent experts with degrees and research experience in various scientific fields comprise the Committee. (Cal. Code Regs., tit. 27, § 25302, subd. (b)(1)(i), (ii).) The Governor appoints the committee chairperson, who calls and presides over meetings, designates an executive secretary, and designates subcommittees. (Cal. Code Regs., tit. 27, § 25302, subd. (c).) The chairperson possesses no special authority apart from these administrative duties. The state's qualified experts for the purpose of identifying carcinogens are members of the Committee. (Cal. Code Regs., tit. 27, § 25302, subd. (a).)

The Committee's guidance criteria govern the review of a given chemical. Under the criteria, the Committee uses a weight of evidence approach to evaluate the information on any given chemical, including "all evidence bearing on the issue of carcinogenicity shown through scientifically valid testing according to generally accepted principles" of scientific inquiry.

At issue in the case before us is criterion No. 1D, which states the Committee will "normally identify a chemical for listing" if "the weight of scientific evidence clearly shows that [the] chemical causes invasive cancer in humans, or that it causes invasive cancer in animals (unless the mechanism of action has been shown not to be relevant to humans)." As the trial court aptly noted "This case is about that 'unless.'"

Guidance criteria are not intended to be binding regulations or to be slavishly followed. Instead, "these criteria are intended to give the Committee maximal flexibility in evaluating all pertinent scientific information" and "are intended neither to limit the scope of the Committee's consideration of all appropriate cumulated scientific information, nor to limit the use of best scientific judgment available at the time." The criteria require "scientific judgments which can only be based on experience . . . Thus, few of the criteria are amenable to the use of absolute restrictions of either a quantitative or qualitative nature."

The Committee does not conduct independent scientific studies or experiments on the carcinogenicity or toxicity of chemicals. Instead, OEHHA prepares a summary of the current state the scientific evidence on the chemicals' carcinogenicity, a hazard identification document (HID). To prepare the HID, OEHHA reviews scientific literature on the chemical and solicits information from the public. Once prepared, the HID is released to the Committee and the public for a 45-day comment period. At the close of the comment period, OEHHA provides the Committee with a copy of all comments and supporting documents for review.

**Consideration of DINP by the Committee**

In 2009 the Committee began reviewing DINP when OEHHA asked it to rank a set of chemicals for review. Chemistry and other entities submitted over 200 pages of comments to support the argument that DINP should be ranked as no or low priority for review. They argued the mechanism of carcinogenesis does not operate in humans.

4

However, the Committee voted on May 29, 2009, to rank DINP as a high priority chemical for its review.

OEHHA issued a notice to interested parties on October 16, 2009, soliciting information on the carcinogenicity of DINP. The public comment period lasted 60 days. OEHHA, after reviewing the submitted material, prepared a 77-page HID. The HID included the most current and pertinent information on the carcinogenicity of DINP, including research and evidence on the mechanisms of action by which DINP operates. The HID was not intended to be a comprehensive document citing every study, but a "look at new more recent literature and thinking on those hypotheses."

Although there were no human studies of the carcinogenicity of DINP, the HID discussed 12 dietary carcinogenicity studies on laboratory animals. OEHHA provided the studies to the Committee. No known carcinogenicity studies were omitted. The HID referenced 114 documents and provided the documents to the Committee. Among the documents were 32 referenced by Chemistry and others in response to the notice to interested parties.

The HID summarized the 12 animal studies and noted three cancers seen at statistically significantly levels: liver tumors, mononuclear cell leukemia, and kidney tumors. Other rare or noncommon tumors were seen, but not at statistically significant levels.

In addition, the HID noted that the mechanisms by which DINP induces tumors are unknown. However, several studies identified possible mechanisms of action. These include: activation of peroxisome proliferator activated receptors (PPAR), activation of constitutive androstane receptor and pregnane X receptor, effects on steroidogenesis and androgen-responsive tissues, tumor necrosis factor-alpha induction, and alpha 2u-globulin nephropathy.

OEHHA released the HID to the Committee on October 7, 2013, along with the supporting documents. Concurrently, OEHHA released the HID to the public for a 45-

5

day comment period.  When the comment period ended, OEHHA provided all public comments and supporting documents to the Committee on November 20, 2013.

**Meeting and Vote**

On December 5, 2013, the Committee met to discuss and vote on DINP.  Staff counsel for OEHHA told the Committee that "there are certain criteria for listing chemicals.  And you have those criteria in front of you.  You're [*sic*] listing decisions should be based on those criteria, and the discussions you have on those criteria."  In addition, counsel stated the Committee was not obligated to render a decision that day, and could ask OEHHA to provide further information.

As the meeting continued, the Committee heard testimony from OEHHA scientists about DINP.  The Committee also heard testimony from four people representing Chemistry and others opposing listing DINP.

Following the presentations, the Committee questioned the presenters and discussed the evidence before it.  Members also discussed Chemistry's argument that the mechanism operating in animals is not relevant to humans.

At the conclusion of the presentation and discussion, the chairperson, Thomas Mack, called for a vote by the Committee.  Six members voted to identify DINP as known to the state to cause cancer, one voted against, and one abstained.  Following the Committee's vote, OEHHA added DINP to the Proposition 65 list on December 20, 2013.

**Trial Court's Decision**

Chemistry filed suit against OEHHA, challenging the listing of DINP.  In denying Chemistry's petition for writ of mandate, the court stated Chemistry would be entitled to a writ if it "could prove the [Committee's] decision was based on an incorrect interpretation of the law.  [Chemistry] fails to make this showing."

6

The court rejected Chemistry's argument that the HID was incomplete, noting the document discussed a number of studies relied on by Chemistry in support of its argument that animal cancers were not relevant to humans. In addition, OEHHA accompanied submission of the HID with voluminous materials relating to DINP's carcinogenicity. These documents included studies in support of Chemistry's argument that the mechanism operative in rats did not apply to humans. Chemistry members also spoke at length at the public meeting, arguing against the listing.

Chemistry also claimed the Committee lacked adequate time to review this voluminous information. The court found "absent evidence to the contrary, the court will assume the [Committee] reviewed sufficient evidence to come to an informed decision. (Evid. Code, § 664.)"

Chemistry argued the studies demonstrated that the mechanisms that cause cancer in rodents, such as PPAR, do not operate in humans. The court disagreed: "[S]ome of the studies [Chemistry] cites are less categorical than it suggests. For example, the ILSA Health and Environmental Sciences Institute concluded 'it is unlikely that peroxisome proliferators are carcinogenic to humans under anticipated conditions and levels of exposure, although their carcinogenic potential cannot be ruled out under extreme conditions of exposure.' " The court found it clear that the Committee considered the very evidence Chemistry accused it of disregarding. Committee members discussed the issue of mechanistic data and its relevance to humans, stated they understood the issue, and "considered, and wrestled with" the evidence of mechanism.

Finally, the court addressed Chemistry's contention that Mack incorrectly outlined the guidance criteria, invalidating the entire Committee review process. After carefully reviewing the comments Chemistry posits as incorrect interpretations of the law, the court determined Mack's statements were susceptible to several alternative interpretations.

7

More importantly, the court noted, the Committee members had the guidance criteria in front of them and were twice instructed to follow those criteria. In order to find the Committee's decision arbitrary and capricious, "the court would have to assume the remaining [Committee] members followed Mack's rather garbled and possibly erroneous interpretation of the law rather than the guidance criteria they were instructed to follow. The court cannot make this assumption." The court denied the petition.

## DISCUSSION

### Standard of Review

In order to overturn OEHHA's listing of DINP, Chemistry must show OEHHA's action is "inconsistent with the governing statute, section 25249.8." (*Western Crop Protection Assn. v. Davis* (2000) 80 Cal.App.4th 741, 757.) A review of OEHHA's scientific analysis regarding a chemical's listing under Proposition 65 requires deference: " ' "[I]n technical matters requiring the assistance of experts and the study of marshaled scientific data as reflected herein, courts will permit administrative agencies to work out their problems with as little judicial interference as possible." ' " (*Exxon Mobil Corp. v. Office of Environmental Health Hazard Assessment* (2009) 169 Cal.App.4th 1264, 1277 (*Exxon*).)

We defer to the agency's authority and presumed expertise and do not reweigh the evidence or substitute our judgment for that of the agency. If the agency has adequately considered all relevant factors and demonstrated a rational connection between those factors, the choice made, and the purposes of the statute, we will uphold the decision. We set aside the decision only if it was arbitrary, capricious, or entirely lacking in evidentiary support. (*Exxon, supra*, 169 Cal.App.4th at p. 1277.)

### The Committee's Decision

At the conclusion of the review process, six of the Committee's eight scientists found DINP causes several types of invasive cancers in laboratory animals and the

8

evidence was not sufficient to show that all of the possible mechanisms underlying these cancers are not relevant to humans. Consequently, OEHHA added DINP to the list of chemicals known to the state to cause cancer.

On appeal, Chemistry challenges the decisionmaking process, focusing on several comments made by the chairperson, Mack. Chemistry contends Mack incorrectly instructed the Committee that the evidence of mechanism was irrelevant and directed the Committee to apply a different standard of his own creation. According to Chemistry, "it is clear that the instructions so infected the [Committee's] deliberations that the decision to list DINP was arbitrary and capricious."

Preliminarily we note, as the trial court observed, the Committee never explained the basis for its determination, and never explained how it evaluated the evidence on whether animal studies were relevant to humans. An administrative body making a quasi-legislative decision such as the one before us is not generally required to either make findings or explain how the evidence supports its decision. (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 787.) As a consequence the trial court found: "[T]he lack of findings or an explanation may make it difficult for [Chemistry] to show the [Committee's] decision was arbitrary or capricious. This difficulty is then compounded by the fact that, absent evidence to the contrary, the court must presume the [Committee] properly performed its duties. (Evid. Code, § 664.) Here, the primary evidence to the contrary consists of the transcript of the public hearing. But at no point during that hearing did the [Committee] clearly explain its views on the evidence on human relevance." As the trial court recognized, we are left with the presumption that the Committee properly performed its duties and the burden is on Chemistry to show the Committee's decision is arbitrary, capricious, or without evidentiary support.

At the hearing, OEHHA's staff counsel informed the Committee that its listing decision should be based on the published criteria for listing, a copy of which was

9

provided to each member. Counsel stated, "you have those criteria in front of you. You're [*sic*] listing decisions should be based on those criteria." Under the criteria provided to the Committee, they were directed to identify a chemical for listing if the weight of scientific evidence shows it causes invasive cancer in animals "unless the mechanism of action has been shown not to be relevant to humans." Subsequently, counsel reminded the Committee "if the weight of scientific evidence clearly shows that certain chemicals cause invasive cancer . . . in animals, unless a mechanism of action has been shown not to be relevant to humans, the Committee will normally identify the chemical for listing."

Juxtaposed against these correct statements of the decisionmaking process are comments by chairperson Mack, which Chemistry argues directed the Committee to "ignore the mechanistic data, contrary to the published Criteria," advice which tainted the voting process.

The parties focus on two statements made by Mack towards the end of the hearing. In the first Mack stated:

"My own view is that I wish the proposition had been worded a little bit better. I wish it had said in humans, but it didn't say in humans. And that means that we're left either pretending that we're the Supreme Court, and we can interpret and make law, or we can simply be technologists and apply the rules that we're given. And I think we're -- my own position is we're stuck with the latter.

"So the question to me is does this stuff cause cancer? And I have to rely upon the dose response relationships. And I actually am moved by the number of cancers which pop up, in an unusual circumstance, including the kidney, the pancreatic islet cell and the leukemia. I understand completely points that [Committee member] David [Eastmond]

10

has made about – and that the regulated community has made about the mechanism issue.[2]

"And I wouldn't be a bit surprised to find in the long run that each of these tumor frequencies can be explained by mechanisms that are not pertinent in humans.

"But my gut response right now is that that can't be an assumption I can make. And so my inclination is to make the judgment on the basis of whether or not the cancers that are caused in mice are invasive and truly malignant. And I presume that that's -- not presume. I know that that's the case."

We read Mack's comments as acknowledging that listing might not be appropriate in the "long run" (the future) if the scientific evidence reveals DINP-caused tumors can be explained by mechanisms not relevant to humans. However, "right now" (presently) Mack cannot assume "the number" of "invasive and truly malignant" cancers which "pop up, in unusual circumstances" were caused by a mechanism that is not relevant to humans. Mack did not misstate the law in his comment.

After Mack's statement, Committee member Duncan Thomas quoted from the guidelines: "As I read the guidelines that says that if it causes invasive cancer in animals parenthesis, unless the mechanism of action has been shown not to be relevant in humans." He continued: "[W]e clearly show that the PPAR alpha mechanism is not relevant in humans, but that's not the only possible mechanism, that there are others about which we are simply unsure. And so the possibility that it's relevant [in humans] still stands . . . ."

Mack then made the second statement:

---

2 David Eastmond discussed the evidence concerning the relevance of animal studies to humans. Eastmond concluded "When you get this many [tumor types], it really is very difficult not to list it." But he also stated: "I'm right now not convinced to list, just simply because I see enough weaknesses on each of these that I don't feel real confident."

11

"Having -- being the person who wrote those guidelines, I have to try and describe to you the reason why that verbiage was put in there. Can you picture a circumstance where there's extremely good epidemiologic data suggesting that there is no effect on humans, a carcinogenic effect? And, at the same time, there is one or two animal studies with liver cancer in rates, in which there is a marginally increased effect.

"And I think the point of that mechanistic inclusion in the criteria document is thinking about that rather than this. Here we're in a situation where there is no epidemiologic data. We have to go solely on the animal data."

Shortly afterward Mack reiterated: "Did you hear what I said about why the panel -- why we wrote those criteria? We wrote them for the circumstance in which there is a conflict between human epidemiologic data and information from animals. And, in any case, I don't think we can discuss it any further. We have to take a vote now.

"So if you'll permit me, we'll go ahead and do that."

Chemistry argues Mack's statement again misstated the law to the Committee. We agree Mack's statement is confusing enough to be susceptible to several interpretations. It might be interpreted to state that the guidance criteria require listing based on animal studies alone, even if epidemiological studies show no effect on humans, unless there is additional evidence showing the mechanism of action in animals has no relevance to humans. This would allow a chemical to be listed even though studies on humans showed it did not cause cancer in humans, which runs afoul of the criteria. However, Mack's comments can also be read to state that, in the absence of human studies, the Committee must rely on animal studies. Mack earlier told the Committee "in the absence of epidemiologic information, we're stuck making decisions about animal data." This is not an incorrect statement of the law.

Mack's comments lacked clarity, but any ambiguity cannot be considered in isolation. The Committee had before it the guidance criteria, which Chemistry does not dispute state the law accurately. Committee members, made up of independent experts,

12

were twice instructed to follow the criteria. Based on the totality of the circumstances surrounding the decision, we cannot find the Committee's decision was arbitrary and capricious. We cannot assume Committee members failed to follow the criteria they were instructed to follow and instead were led astray by Mack's somewhat confusing and possibly erroneous interpretation.

In the absence of evidence to the contrary, we must presume the Committee properly carried out its obligation and followed its own guidance criteria. Again, the question before us is not whether the record establishes the Committee complied with requirements, but whether the evidence establishes the agency failed to comply. (Evid. Code, § 664; *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976.)

**Adequacy of the HID**

Chemistry acknowledges OEHHA based its decision to list DINP on the Committee's recommendation, but argues OEHHA preluded the Committee from considering all relevant factors by issuing a "biased, incomplete and misleading HID." Chemistry also faults OEHHA's allowing only two weeks for the Committee to consider opposing comments and 7,000 pages of scientific studies. After painstakingly setting forth the alleged omissions, Chemistry states the "only plausible explanation for the HID's many inaccuracies is agency bias in favor of listing."

The scientific evidence collected by OEHHA revealed DINP causes three types of cancer in rodents: kidney tumors, liver tumors, and mononuclear cell leukemia. Some evidence suggests the mechanism of action of these three cancers is not relevant to humans because the cancers occur in rodents through a mechanism that does not occur in humans or because of physiological differences between rodents and humans.

Chemistry cites authority stating we must ensure that the agency has " ' " ' "adequately considered all relevant factors." ' " ' " (*Exxon, supra,*

13

169 Cal.App.4th at p. 1277.) Chemistry also notes the Committee's own guidance criteria require it to consider "all evidence bearing on the issue of carcinogenicity shown through scientifically valid testing according to generally accepted principles" of scientific inquiry. Since the Committee failed to consider the evidence showing DINP was not a human carcinogen, Chemistry argues its decision to list DINP is arbitrary and capricious.

Chemistry mounts a multiprong attack on the alleged HID failures: omission of primate studies; omission and mischaracterization of critical toxicity reviews; mischaracterization of evidence regarding kidney tumors; mischaracterization of evidence regarding liver tumors; mischaracterization of evidence regarding mononuclear cell leukemia; and mischaracterization of evidence of pancreatic, testicular, and uterine tumors. According to Chemistry, the record is clear that the HID presented a misleading picture of the science and biased the Committee in favor of listing DINP.

However, our review of the record reveals the Committee considered much of the evidence Chemistry accuses it of ignoring. Chemistry faults the HID for failing to adequately discuss studies showing that kidney tumors, liver tumors, and leukemia observed in rodents are not relevant in humans. However, one of Chemistry's members submitted extensive comments to OEHHA reviewing and discussing these other studies. This critique explained in great detail the studies Chemistry claims reveal DINP caused animal cancers are not relevant to humans. The additional materials were provided to the Committee prior to the meeting. Chemistry addressed the Committee at the public meeting and provided a detailed explanation of their view that the rodent studies were not relevant to humans.

The HID itself does discuss some of the issues Chemistry claims it ignores. The HID discusses a study that reported no human counterpart to rodent leukemia. Regarding another study cited, HID stated: "It has also been suggested that rat and mouse liver tumors induced by PPARα agonists are not relevant to human cancer risk

14

assessment because of differences in activation characteristics between rodent and human PPARα." The HID discussed another study that found "The protein α2u-globulin is specific to male rats, and some renal tubule cell tumors induced by agents that induce α2u-globulin accumulation in male rat renal tubules have been suggested to be not relevant to human cancer risk assessment."

Nor did the subsequent discussion of the HID by Committee members reveal a monolithic approach to the conflicting evidence. Committee members acknowledged struggling with the question of whether the evidence that DINP caused cancer in animals was relevant to humans. Committee member Joseph Landolph stated "I struggle with the issue of the relevance to human tumors." The key issue, according to Committee member Peggy Reynolds, "is really whether the mechanism of action has been shown to be relevant in humans." Committee member Eastmond agreed, stating, "The key question now becomes are those [cancers] relevant to humans?" Committee member Jason Bush revealed: "I guess what I'm wrestling with is whether this is meaningful for humans?" Chairperson Mack summed up the members concerns: "I understand completely the points . . . the regulated community has made about the mechanism issue."

The Committee did not disregard evidence presented by Chemistry regarding mechanism. Chemistry submitted studies and offered arguments disputing the relevance of rodent studies to humans. The HID included studies cited by Chemistry and members of the Committee admitted struggling over the issue. We cannot find the HID presented a biased view of the relevant data.

In a related argument, Chemistry contends the time period allowed for the Committee to review the voluminous underlying toxicity reviews and scientific studies "was patently inadequate" and as a result the Committee's understanding of the state of the science regarding DINP was shaped by the HID's inaccurate summary of the evidence. The trial court rejected this argument: "Absent evidence to the contrary, the

15

court will assume the [Committee] reviewed sufficient evidence to come to an informed decision. (Evid. Code, § 664.)"

OEHHA provided the HID to the Committee on October 7, 2013, along with references cited in the document and including 32 documents submitted by the industry. On November 20, 2013, OEHHA gave additional documents submitted by the industry in response to the HID to the Committee. The meeting took place two weeks later on December 5, 2013.

At the beginning of the meeting, OEHHA's staff counsel informed the Committee they did not have to vote that day and could request additional time. Four industry members were given 30 minutes to present arguments against listing DINP. Committee members followed up with questions for the presenters. At the conclusion of the questioning, Mack allowed industry members to provide further comment. The record reveals the Committee review was not rushed and did not render the Committee's decision arbitrary and capricious.

**Negative Consequences of Listing**

Finally, Chemistry contends the Committee's decision to list DINP carries with it serious consequences. The listing may cause manufacturers to replace DINP with other chemicals that are less safe, not as well studied, and less effective. In addition, "The listing will lead to an increase in unnecessary warnings on consumer products, because manufacturers can insulate themselves from enforcement litigation by applying warnings to any product containing DINP. (§ 25249.6.) The overuse of Proposition 65 warnings will cause individuals to become desensitized to legitimate warnings that *are* supported by scientific evidence, completely undermining Proposition 65's value and purpose." Amicus curiae Chamber of Commerce of the United States of America echoes this argument in its brief. Chemistry also warns of "a barrage of harmful and costly litigation" filed by "bounty hunters" against manufacturers who use DINP.

16

We note these objections to the consequences of the Committee's decision do not address the propriety of the decision itself.  Consequences do not bear on OEHHA's discretion to list DINP.

In addition, the decision to list a chemical does not determine whether or not a warning is required.  Under Proposition 65, a business can avoid providing a warning if it can prove that the exposure caused by its product is below the level that will have "no significant risk."  (§ 25249.10, subd. (c).)  OEHHA's decision requires listing DINP.  Subsequently, Chemistry will have the opportunity to prove it is exempt from the Proposition 65 requirements because a specific exposure that it causes is below the level that will have no significant risk.  (*Exxon, supra*, 169 Cal.App.4th at p. 1291.)

## DISPOSITION

The judgment is affirmed.  OEHHA shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                    /s/
                                    RAYE, P. J.



We concur:



    /s/
ROBIE, J.



    /s/
DUARTE, J.

Filed 7/8/20

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT et al.,<br><br>Defendants and Respondents. | C079260<br><br>(Super. Ct. No. 34-2014-80001868-CU-WM-GDS)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

APPEAL from a judgment of the Superior Court of Sacramento County, Christopher E. Krueger, Judge. Affirmed.

Gibson Dunn & Crutcher, Theodore J. Boutrous, Jr., Vanessa C. Adriance, Robert E. Dunn and Julia L. Reese for Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Sally Magnani, Assistant Attorney General, Susan S. Fiering and Harrison M. Pollak, Deputy Attorneys General, for Defendants and Respondents.

U.S. Chamber Litigation Center, Janet Galeria; Munger, Tolles & Olson, Fred A. Rowley, Jr., Patrick J. Cafferty, Jr., Jeffrey Y. Wu and David J. Feder as Amicus Curiae on behalf of Plaintiff and Appellant.

1

THE COURT:

The opinion in the above-entitled matter filed June 10, 2020, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
ROBIE, J.


_____/s/_____
DUARTE, J.